J. S30021/15

**NON-PRECEDENTIAL DECISION – SEE SUPERIOR COURT I.O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA   :      IN THE SUPERIOR COURT OF
                                       :           PENNSYLVANIA

v.          :

                           :

RENALDO A. ROBICHAW,       :          No. 2746 EDA 2014

                           :

          Appellant    :

Appeal from the Judgment of Sentence, August 14, 2014,
in the Court of Common Pleas of Philadelphia County
Criminal Division at No. CP-51-CR-0005784-2013

BEFORE:  GANTMAN, P.J., FORD ELLIOTT, P.J.E. AND JENKINS, J.

MEMORANDUM BY FORD ELLIOTT, P.J.E.:        **FILED JULY 16, 2015**

Appellant appeals his conviction for third degree murder and possession of an instrument of crime.[1]  Finding no error below, we affirm.

On January 28, 2013, appellant killed a roommate at their apartment in Philadelphia with a single stab wound through the heart.  Appellant was convicted by bench trial on June 5, 2013, and sentenced to 18 to 36 years' imprisonment plus 5 years' probation on August 14, 2014.

On appeal, appellant argues that the evidence was insufficient to support a conviction for third degree murder in that the evidence of malice was insufficient or that the Commonwealth failed to adequately disprove self-defense.  Appellant also challenges the discretionary aspects of his

---

[1] 18 Pa.C.S.A. §§ 2502(c) and 907(b), respectively.

sentence, arguing that the court failed to give adequate weight to appellant's age and physical and mental disabilities.

We find no error with the trial court's holding. After a thorough review of the record, the briefs of the parties, the applicable law, and the well-reasoned opinion of the trial court, it is our determination that there is no merit to the questions raised on appeal. Judge Rose Marie DeFino-Nastasi's meticulous, 15-page opinion, filed on January 26, 2015, comprehensively discusses and properly disposes of the questions presented. We will adopt it as our own and affirm on that basis.

Judgment of sentence affirmed.

Judgment Entered.

_____

Joseph D. Seletyn, Esq.
Prothonotary

Date: 7/16/2015

IN THE COURT OF COMMON PLEAS OF PHILADELPHIA

CRIMINAL TRIAL DIVISION

COMMONWEALTH OF PENNSYLVANIA   :            CP-51-CR-0005784-2013

v.

CP-51-CR-0005784-2013 Comm. v. Robichaw, Renaldo A.
Opinion

RENALDO ROBICHAW



7249967091

**OPINION**

Rose Marie DeFino-Nastasi, J.

**FILED**

JAN 2 6 2015

Criminal Appeals Unit
First Judicial District of PA

## PROCEDURAL HISTORY

On June 5, 2013, the Defendant was found guilty after a bench trial, presided over by the Honorable Rose Marie DeFino-Nastasi, of Third Degree Murder, 18 Pa.C.S. § 2502(c), as a felony of the first degree; and Possession of an Instrument of Crime (PIC), 18 Pa.C.S. § 907(b), as a misdemeanor of the first degree. Notes of Testimony (N.T.) 4/24/14 at p. 44.

On August 14, 2014, the Defendant was sentenced to eighteen (18) to thirty-six (36) years for the Third Degree Murder conviction, and five (5) years probation for the PIC conviction, to run consecutively. N.T. 8/14/14 at 23:4-10.

On September 3, 2014, the court denied the Defendant's Post Trial Motion without a hearing.

On September 30, 2014, the Defendant filed the instant appeal to the Superior Court of Pennsylvania.

On November 18, 2014, Defendant's counsel filed a Statement of Matters Complained of on Appeal, pursuant to an order of the court directing counsel to file a 1925(b) statement.

1

## FACTS

On Monday, January 28, 2013, Defendant Renaldo Robichaw stabbed and killed his roommate, Albert Benjamin Smith, inside their home in the Carroll Park section of Philadelphia. The decedent was found dead in his room on Wednesday, January 30, 2013. Kevin Parker (roommate of the Defendant and the decedent) and Timothy Robichaw (nephew of the Defendant and cousin of the decedent) discovered the decedent's body on the floor of the decedent's room.

The Medical Examiner, Dr. Aaron Rosen, determined that the decedent's cause of death was a stab wound to the chest. N.T. 4/23/14 at p. 93-94. The stab wound was approximately five and three quarter (5 ¾) inches deep. *Id.* at p. 95. The manner of death was homicide. *Id.* at p. 94.

Deaitra McDonald testified that she lived next door to the Defendant at the time of the murder. Mrs. McDonald referred to the Defendant as "Squeaky," because he had a high pitched voice and sounded like a female when he yelled. N.T. 4/23/14 at pp. 22-24. Mrs. McDonald testified that she constantly heard arguing from the Defendant's residence. *Id.* at p. 30, 34.

Mrs. McDonald heard the Defendant and another person arguing loudly between 10:00 and 11:00 P.M. on January 28, 2013. After approximately six (6) to ten (10) minutes of arguing, Mrs. McDonald heard a thump against the wall between the Defendant's home and hers, then a boom. *Id.* at p. 26. The thump sounded like it came from the second-floor, front room of the Defendant's home. *Id.* at p. 28. Mrs. McDonald testified that after the thump, the Defendant walked outside, unchained his bicycle, and exclaimed loudly: "You better hope somebody finds your fuckin' ass before you bleed to death." *Id.* at 28:20-23.

Mrs. McDonald testified that the last time she saw the decedent was the morning of Monday, January 28, 2013. *Id.* at pp. 31-32. She also testified that the next time she saw the

2

Defendant was on Wednesday, January 30, 2013, when the police came to the Defendant's home. Mrs. McDonald spoke to police that evening and conveyed everything that she had heard. *Id.* at pp. 34-35.

Ann McDonald, the daughter of Deaitra, testified that she also lives next door to the Defendant. Sometime before midnight on January 28, 2013, Ms. McDonald heard the Defendant arguing with someone, but did not recognize the other voice. *Id.* at p. 45. She testified that she heard the Defendant say, "You all better stop f'ing with me or they are going to find you dead in here." N.T. 4/23/14 at pp. 43-44.

Kevin Parker testified that he lived at 1651 North 60th Street with the Defendant and the decedent for approximately a year-and-a-half. N.T. 4/23/14 at p. 55. He paid rent to the Defendant's nephew, Tim Robichaw.[1] *Id.* at p. 56. Mr. Parker testified that the Defendant and the decedent argued off-and-on. The Defendant would tell the decedent that the decedent was getting on the Defendant's nerves. *Id.* at pp. 57-58.

Mr. Parker testified that he was in his room when he heard the Defendant and the decedent arguing and yelling around 12 A.M. on Monday, January 28, 2013. Mr. Parker testified that the decedent said to the Defendant, "If you don't leave me alone, I'm going to go back in my room." The Defendant responded, "If you don't get out of my room, I will hurt you." *Id.* at p. 59.

Mr. Parker gave two statements to homicide detectives. Mr. Parker testified that he did not tell homicide detectives that he had heard the Defendant and the decedent arguing when he gave his initial statement on Wednesday, January 30, 2013. *Id.* at p. 78-80. Nor did he tell detectives about finding the decedent's body on the floor of the decedent's room. *Id.* at p. 80. Mr. Parker was afraid the detectives might think that he had some involvement in the decedent's death. *Id.* at pp. 80-81.

---

[1] Mr. Parker incorrectly testified that Tim Robichaw is the Defendant's uncle. *Id.* at p. 56, 127.

Detectives took a second statement from Mr. Parker on Thursday, January 31, 2013. *Id.* at p. 81. Mr. Parker then told detectives that when the Defendant returned home Monday evening, the Defendant started yelling and went "on a rampage." *Id.* at p. 112. The Defendant was yelling comments like, "I'm sick of y'all mother fuckers" and "I'm really sick of you, Al [the decedent], you crack-head mother fucker." *Id.* at p. 82.

The decedent came out of his room and walked to the Defendant's room. Mr. Parker could hear the decedent tell the Defendant that he was tired of being called names, and that the Defendant had to stop yelling and screaming. The Defendant then yelled at the decedent, "If you don't leave my room, I will hurt you, you mother fucker." The decedent responded to the Defendant, "Well do what you got to do." *Id.* at pp. 111.

Mr. Parker heard the decedent walk back to his room. *Id.* at pp. 110-12; Commonwealth Exhibit 5. He then heard the Defendant call 911. Minutes later, Mr. Parker heard the Defendant call the police again and tell them not to come. *Id.* at pp. 61-63, 87-91. Mr. Parker testified that the Defendant and the decedent continued to argue between the first 911 call and the second 911 call. *Id.* at p. 89.

Mr. Parker left the house to tell Tim Robichaw that the Defendant and the decedent were yelling at each other. *Id.* at pp. 60-61. He testified that he did so because he did not want to get in the middle of their argument. Tim told Mr. Parker not to worry about it. *Id.* at pp. 66-67.

Mr. Parker testified that he did not return to the house until Wednesday afternoon, January 30, 2013. *Id.* at pp. 66-68. Mr. Parker saw the Defendant, but did not ask the Defendant where the decedent was. *Id.* at p. 71. Mr. Parker saw that the decedent's door was open a crack; the decedent's door was usually kept shut. *Id.* at pp. 73-74. Mr. Parker peeked in the decedent's room, looked down, and saw a foot and part of a leg. *Id.* at p. 86. Mr. Parker knew something

4

was wrong, so he went to speak with Tim. He did not tell Tim what he saw. Mr. Parker and Tim went back to the house, walked upstairs, and found the decedent's body. *Id.* at pp. 69-70. Tim called the police. *Id.* at pp. 77-79.

Mr. Parker testified that the Defendant had a backpack on and was getting ready to leave the house on his bike as the police arrived. *Id.*

Crime scene photos taken of the scene showed a mark on the decedent's door. Mr. Parker testified that the mark was the result of an argument between the Defendant and the decedent that occurred one month prior to the stabbing. The Defendant was chasing the decedent with nunchucks. *Id.* at p. 108-09.

Timothy Robichaw testified that the Defendant is his uncle and the decedent was his cousin. N.T. 4/23/14 at p. 127. Tim saw the decedent every day because the decedent would sometimes work with him. The decedent worked with him on Monday, January 28, 2013. *Id.* at p. 130. Mr. Parker came to Tim's house that Monday evening and told him that the Defendant and the decedent were arguing. Mr. Parker would come to Tim when there were problems between the Defendant and the decedent. *Id.* at p. 128-30. Tim told Mr. Parker not to worry about it because they were always fighting. *Id.*

Tim did not see the decedent on Tuesday, January 29, 2013. *Id.* at p. 130.

Tim testified that Mr. Parker came to his house on Wednesday, January 30, 2013, and asked if Tim had seen the decedent. Tim replied that he had not and told Mr. Parker to knock on the decedent's door. Mr. Parker left and when he returned, Mr. Parker told Tim that the decedent did not answer. *Id.* at p. 131. Mr. Parker and Tim went back to the house together. When they arrived, Mr. Parker stopped at the door and told Tim to go upstairs. Tim went to the decedent's room and saw that the door to the decedent's room was open a crack. Tim tried to push the door

open, but it was blocked; he looked down and saw a foot. Tim called the decedent's name and when the decedent did not respond, Tim called 911. *Id.* at pp. 131-32.

Firemen arrived and went to the decedent's room. *Id.* at p. 133-34. Tim stayed on the front porch. While the firemen were upstairs, the Defendant came out of the house with a backpack on and grabbed his bicycle from the front porch. *Id.* at p. 134-35. Tim told the Defendant that Mr. Parker had told him about the fight between the Defendant and the decedent. The Defendant replied that everything was cool, and that the decedent and he had squashed it. *Id.* at p. 135-36.

Tim immediately told Sergeant Francis Kelly that the Defendant lives there, that the Defendant had just come from upstairs, and not to let the Defendant leave. *Id.* at pp. 136, 152.

The Defendant and Tim were taken to the police station at 8th and Race Street. Before they left, Tim asked the Defendant why he was taking his backpack. *Id.* at p. 137. Sergeant Kelly told the Defendant that he did not have to bring his backpack to the station. Since the Defendant was not permitted to go back into the house, Tim put the Defendant's backpack in his truck. *Id.* The Defendant and Tim were transported to the police station and gave statements to detectives.

After Tim gave his statement, he went home and realized that the Defendant's backpack was still in his trunk. Tim looked inside the backpack and saw that there was a knife in it. *Id.* at p. 138. Tim called homicide detectives to let them know about the backpack and the knife. Tim brought the backpack and the knife to the police station; he did not touch the knife at any point. *Id.* at p. 140. Tim testified that upon his arrival at the police station, one of the officers told him that the Defendant had confessed. *Id.* at pp. 137-40.

Detective John Harkins read the Defendant's statement at trial. *Id.* at pp. 165-73.

6

The Defendant recounted the events prior to the stabbing in his statement to police. The Defendant stated that he would argue with Mr. Parker and the decedent because they would turn the lights in the house off at night, and the Defendant could not see when he would return home. The lights were off when the Defendant returned home around 9:00 P.M. on the night of the stabbing. *Id.* at p. 174. The Defendant went upstairs and started yelling at the decedent about the lights.

The decedent came out of his room and went to the Defendant's room. The decedent screamed at the Defendant, because the Defendant would slam his (the Defendant's) door open and closed. The decedent was getting angry, so the Defendant called 911. The Defendant stated that the decedent was screaming and jumping back and forth, and that it seemed like the decedent was smoking crack and drinking beer. *Id.* at p. 175.

The Defendant picked up a steak knife to cut oranges while he waited for the police. When the Defendant picked up the knife, the decedent lunged at him. *Id.* at p. 175. The Defendant put his hands up and blocked the decedent. The Defendant had the knife in his hand and poked the decedent. When the Defendant pushed the decedent back, the decedent calmed down and walked back to his room. *Id.* at pp. 175-76. The decedent did not state to the Defendant that he had been stabbed. *Id.* at p. 176. The Defendant called 911 and told the police not to come. *Id.* at p. 176. The 911 operator stated to the Defendant that his call to the police could not be cancelled. *Id.*

The Defendant got his bicycle and went outside. As the Defendant was leaving, the decedent came to the top of the steps inside the house and yelled something at the Defendant. The Defendant yelled back at the decedent that there was something wrong with the decedent;

7

that the decedent needed medical treatment; and told the decedent "fuck you." *Id.* at p. 176. The Defendant did not return to the house until 5:30 A.M. on Tuesday morning. *Id.* at p. 177.

On Wednesday morning, the Defendant was awoken by his nephew, Tim Robichaw and his roommate, Kevin Parker. Tim asked the Defendant if he had seen the decedent; the Defendant responded that he had not seen the decedent since Monday night. Tim and Mr. Parker knocked on the decedent's door; when the decedent did not answer, they pushed the door open. The Defendant stated to police that the decedent was lying there, not moving, and that there was blood on the wall. *Id.* at p. 177-78.

The Defendant "assumed it was the crack that killed" the decedent. *Id.* at p. 178. The Defendant stated that he did not deliberately stab the decedent; the decedent was acting crazy and ran into the Defendant's knife. He also stated that if he intentionally stabbed the decedent, he would not have waited for the police to come, but he did. The Defendant told detectives: "I stayed outside on my bike the whole time the cops were there. Is that what killers do? No. The cops brought me down here and tried to say that this was intentional. I'm telling you it wasn't. That is the truth." *Id.* at p. 178.

## ANALYSIS

### Issue I

In his Rule 1925(b) statement, the Defendant contends that there was insufficient evidence to sustain his conviction for third degree murder, "given the fact that [the] incident in question occurred in the course of a heated argument in which the victim was both belligerent and the aggressor."

The Defendant is essentially arguing that the Commonwealth failed to prove the element of malice necessary for third-degree murder, or alternatively, that the Commonwealth failed to

8

disprove the Defendant's self-defense claim beyond a reasonable doubt. Evident from the trial record, this contention is without merit.

"It is well established that the test of sufficiency of the evidence is whether, viewing the evidence in the light most favorable to the Commonwealth and drawing all proper inferences favorable to the Commonwealth, the trier of fact could reasonably have determined all elements of the crime to have been established beyond a reasonable doubt." *Com. v. Keblitis*, 456 A.2d 149, 150 (Pa. 1983); *Com. v. Jones*, 874 A.2d 108, 120-21 (Pa. Super. 2005). "The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence." *Jones*, 874 A.2d at 120 (quoting *Com. v. Bullick*, 830 A.2d 998, 1000 (Pa. Super. 2003)).

Third-degree murder is defined in the Crimes Code as "All other kinds of murder" other than first-degree murder or second-degree murder. 18 Pa.C.S. § 2502(c). "Third-degree murder occurs when a person commits a killing which is neither intentional nor committed during the perpetration of a felony, but contains the requisite malice." *Com. v. Kling*, 731 A.2d 145, 147 (Pa. Super.), *app. denied*, 745 A.2d 1219 (Pa. 1999) (citing 18 Pa.C.S. § 2502(c)). The elements of third-degree murder, as developed by case law, are a killing done with legal malice, but without the specific intent to kill required in first-degree murder. *Com. v. Hill*, 629 A.2d 949, 951 (Pa. Super. 1993) (citing *Com. v. Pitts*, 404 A.2d 1305 (Pa. 1979)). Malice is established where the defendant's intentional act indicates that the defendant consciously disregarded an unjustified and extremely high risk that his action might cause death or serious bodily harm. *Com. v. Siebert*, 622 A.2d 361 (Pa. Super. 1993). Malice may be inferred from all the attending circumstances surrounding defendant's conduct, such as the use of a deadly weapon on a vital part of the

9

victim's body. *Com. v. Sherwood*, 982 A.2d 483, 493 (Pa. 2009); *Com. v. Ventura*, 975 A.2d 1128, 1142 (Pa. Super. 2009).

The Defendant contends that the element of malice was negated because his actions were necessary to defend himself from the decedent. Malice and self-defense "are mutually exclusive." *Com. v. Fowlin*, 710 A.2d 1130, 1132 (Pa. 1998). In a prosecution for murder, evidence of provocation or self-defense tends to negate the malice required to prove murder. *Com. v. Heatherington*, 385 A.2d 338, 341 (Pa. 1978).

The use of force upon or toward another person is justifiable when the actor believes that such force is immediately necessary for the purpose of protecting himself against the use of unlawful force by such other person on the present occasion. 18 Pa.C.S. § 505; *Ventura*, 975 A.2d at 1143. When a defendant raises the issue of self-defense, the Commonwealth bears the burden to disprove such a defense beyond a reasonable doubt. *Com. v. Bullock*, 948 A.2d 818, 824 (Pa. Super. 2008). The Commonwealth sustains this burden if it establishes at least one of the following: (1) the accused did not reasonably believe that he was in danger of death or serious bodily injury; (2) the accused provoked or continued the use of force; or (3) the accused had a duty to retreat and the retreat was possible with complete safety. *Com. v. Hammond*, 953 A.2d 544, 559 (Pa. Super. 2008), app. denied, 964 A.2d 894 (Pa. 2009) (citing *Com. v. McClendon*, 874 A.2d 1223, 1230 (Pa. Super. 2005)). The Commonwealth need only prove one of these elements beyond a reasonable doubt to sufficiently disprove a self-defense claim. *Com. v. Burns*, 765 A.2d 1144, 1149 (Pa. Super. 2000). In *Com. v. Light*, 326 A.2d 288 (Pa. 1974), the Pennsylvania Supreme Court stated:

> [T]he requirement that the defendant be operating under a reasonable belief that
> he is in imminent danger of death, great bodily harm, or some felony, involves

two elements. First, the defendant must have acted out of an honest, bona fide belief that he was in imminent danger. Second, the belief must be reasonable in light of the facts as they appeared to him. The first element is entirely subjective; the second element is entirely objective.

*Com. v. Perez*, 698 A.2d 640, 646 (Pa. Super. 1997) (citing *Light*, 326 A.2d at 292). Whether a defendant acts out of an honest, bona fide belief and whether such a belief was reasonable are issues properly resolved by the trier of fact. *Perez*, 698 A.2d at 646.

The record supports this Court's finding that at the time of the stabbing, the Defendant did not believe that he was in immediate danger of death or serious bodily harm from the decedent. The Court listened carefully to all of the evidence, reviewed the exhibits, the Defendant's statement, and Mr. Parker's testimony, in particular. The Defendant's actions, in light of the evidence, were not indicative of a person trying to defend himself, but rather prove that the Defendant was the initial aggressor and provocateur.

The Defendant escalated an oral argument into physical violence by stabbing an unarmed individual. The Defendant was heard yelling and "going on a rampage" just before the stabbing. In fact, the Defendant, by his own admission, came home and started yelling at the decedent. The decedent came out of his room to ask the Defendant to stop yelling, screaming, and calling the decedent names. The decedent went back to his room; the Defendant called 911. "The police radio call did not indicate in any way that the Defendant was in fear so much as annoyed by the decedent." N.T. 4/24/14 at p. 41. Further, the Defendant's actions in calling off the police were contradictory to any kind of fear he may have had, and more indicative of a person trying to conceal a criminal act.

11

The Defendant alleged that the decedent lunged at him and that he "just poked" the decedent. A five-and-three-quarter (5 ¾) inch stab wound which penetrated through the decedent's heart and out its back wall cannot by any stretch of the imagination be described as a "poke." N.T. 4/23/14 at pp. 93-95. The decedent was unarmed; the Defendant used a deadly weapon on a vital part of the decedent's body. This Court, as the fact-finder, simply did not believe the Defendant's assertion that the decedent lunged at the Defendant and ran into the Defendant's knife. Although the Defendant claimed to have assumed that the decedent died from crack, witnesses heard the Defendant yell to the decedent, "You better hope somebody finds your fuckin' ass before you bleed to death." N.T. 4/23/14 at p. 28.

The Court also considered voluntary manslaughter in its deliberations. N.T. 4/24/14 at pp. 42-43. Voluntary manslaughter is an intentional killing committed without malice, whereas malice is an essential element of murder. *Heatherington*, 385 A.2d at 341 (citing *Com. v. O'Searo*, 352 A.2d 30, 38, n. 6 (Pa. 1976)). Voluntary manslaughter is defined as follows: (a) A person who kills an individual without lawful justification commits voluntary manslaughter if at the time of the killing he is acting under a sudden and intense passion resulting from serious provocation by the individual killed; or (b) Unreasonable belief killing justifiable—A person who intentionally or knowingly kills an individual commits voluntary manslaughter if at the time of the killing he believes the circumstances to be such that, if they existed, would justify the killing under Chapter 5 of this title (relating to general principles of justification), but his belief is unreasonable. 18 Pa.C.S. § 2503(a), (b); *Com. v. Sanchez*, 82 A.3d 943, 979 (Pa. 2013) (citations omitted).

In explaining what elements are necessary to establish unreasonable belief voluntary manslaughter, which is sometimes referred to as "imperfect self-defense," the Pennsylvania

12

Supreme Court has stated: "This self-defense claim is imperfect in only one respect—an unreasonable rather than a reasonable belief that deadly force was required to save the actor's life. All other principles of justification under 18 Pa.C.S. § 505 must still be met in order to establish unreasonable belief voluntary manslaughter. *Com. v. Bracey*, 795 A.2d 935, 947 (Pa. 2001) (citing *Com. v. Tilley*, 595 A.2d 575, 582 (Pa. 1991)); *Com. v. Arce*, 416 A.2d 1098 (Pa. Super. 1979) (use of knife not reasonable where no weapon directed at defendant). A successful claim of imperfect self-defense reduces murder to voluntary manslaughter. *Com. v. Truong*, 36 A.3d 592, 599 (Pa. Super. 2012) (citing *Tilley*, 595 A.2d at 582.

The Court found that the Defendant was the provocateur, not the decedent; thus, the circumstances required to reduce a killing to voluntary manslaughter were not present. The physical evidence and testimony of the witnesses, viewed in the light most favorable to the Commonwealth, plainly established that the Defendant possessed the requisite malice for third-degree murder.

### Issue II

Defendant lastly asserts that this Court abused its sentencing discretion by imposing an aggregate sentence of eighteen (18) to thirty-six (36) years, plus five (5) years probation. The Defendant contends that the sentencing court failed to give adequate weight to Defendant's age and physical and mental disabilities.

This is a challenge to the discretionary aspects of Defendant's sentence. Sentencing is a "matter vested in the sound discretion of the sentencing judge, and a sentence will not be disturbed on appeal absent a manifest abuse of discretion." *Com. v. Ferguson*, 893 A.2d 735, 739 (Pa. Super. 2006) (citing *Com. v. Hyland*, 875 A.2d 1175, 1184 (Pa. Super. 2005)). "An abuse of discretion involves a sentence which was manifestly unreasonable, or which resulted from

13

partiality, prejudice, bias or ill will." *Com v. McAfee*, 849 A.2d 270, 275 (Pa. Super. 2004). It is more than just an error in judgment. *Id.*

A defendant's right to challenge the discretionary aspects of his sentence on appeal is not absolute. *Com. v. Austin*, 66 A.3d 798 (Pa. Super. 2013). "It is only where an aggrieved party can articulate clear reasons why the sentence imposed by the trial court compromises the sentencing scheme as a whole that we will find a substantial question and review the decision of the trial court." *Com. v. Celestin*, 825 A.2d 670, 676 (Pa. Super. 2003). The defendant must present a "substantial question" as to whether the sentence was inappropriate under a specific provision of the Sentencing Code or was contrary to fundamental norms of the sentencing process. *Com. v. Titus*, 816 A.2d 251, 255 (Pa. Super. 2003).

The Defendant's sentence was imposed after express consideration of the general standards applicable to sentencing and review of the pre-sentence report. N.T. 8/14/14 at pp. 21-23. The offense gravity score (OGS) for Third-Degree Murder is fourteen (14). The Defendant's prior record score (PRS) was a five (5). Under the Deadly Weapon Enhancement/Used Matrix, the sentencing guidelines are 210 months to the statutory limit, plus or minus twelve (12) months. Defense counsel concurred with the sentencing court that this was the recommended range. *Id.* at pp. 3-4. If a sentence is within the statutory limits, an allegation that the sentencing court "failed to consider or did not adequately consider certain factors does not raise a substantial question that the sentence imposed was inappropriate." *Com. v. Wagner*, 702 A.2d 1084, 1085 (Pa. Super. 1997) (citing *Com. v. Cruz-Centeno*, 668 A.2d 536 (Pa. Super. 1995), app. denied, 676 A.2d 1195 (Pa. 1996)).

The sentencing court listened closely to counsels' arguments, victim impact statements, and the Defendant's testimony when he exercised his right of allocution. The Defendant was age

14

fifty-five (55) at the time of sentencing. N.T. 4/23/14 at pp. 2-3. He indicated to the court that he takes Paxil for memory loss. *Id.* The Defendant had a substantial criminal history, indicating a need for incarceration to protect the public; and his mental and physical impairments did not make him unable to understand the wrongfulness of his acts or unable to control his behavior. N.T. 8/14/14 at p. 16-22; Commonwealth Exhibit 9.

The sentencing court imposed a sentence "consistent with the protection of the public, the gravity of the offense as it relates to the impact on the life of the victim and the community, and the rehabilitative needs of the defendant." *Com. v. Frazier*, 500 A.2d 158, 159 (Pa. 1985). The sentence the court imposed was neither unreasonable nor the result of partiality, prejudice, bias or ill will. The Defendant's sentence did not violate sentencing norms nor was it excessively harsh. Therefore, the Court did not abuse its discretion in sentencing the Defendant.

## CONCLUSION

Based on the foregoing, the judgment of sentence of the trial court should be affirmed.

By the Court:

*Rose Marie DeFino-Nastasi*

Rose Marie DeFino-Nastasi, J.

15